UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HAROLD ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-6998 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| DEPUTY SHERIFF KURT BUDDE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Harold Robinson is a pretrial detainee at the Will County Adult Detention Facility ("WCADF"), awaiting trial on a state criminal charge. From time to time, Robinson travels to the Will County Courthouse for hearings. When he returns, the detention facility's policy requires him to undergo a strip search before returning to his cell.

All parties agree that the policy of strip searching detainees after they return from court is a valid safety measure. This lawsuit challenges the way that an officer (mis)behaved during one particular strip search. On September 19, 2018, Defendant Deputy Sheriff Kurt Budde strip searched Robinson when he returned from a court hearing. Robinson alleges that Budde humiliated him during the search by making gestures and sounds about Robinson's penis. He claims that Budde's actions violated his constitutional rights under the Fourteenth Amendment.

Budde has moved for summary judgment. For the reasons that follow, the Court grants the motion.

**Background**

Harold Robinson is a pretrial detainee at WCADF, where he has awaited trial since 2017. The events giving rise to this lawsuit occurred in September 2018. *See* Def.'s Statement of Material Facts,[1] at ¶ 1 (Dckt. No. 51). On September 19, 2018, Robinson appeared in the Will County Courthouse for a hearing. *Id.* at ¶ 5. When detainees return to WCADF from court, they are strip searched before they reenter their housing unit. *Id.* at ¶ 6.

The searches follow a standard routine. Detainees remove their shirts, remove their shoes and clap them over their heads, and remove their pants and socks. *Id.* at ¶ 12. After removing their clothing, detainees face a wall and either pull down or remove their underwear. *Id.* at ¶ 13. A deputy then searches the detainee's groin area, performs a visual cavity search of the detainee's anus, and inspects the detainee's mouth. *Id.* at ¶¶ 15–17. The entire process usually takes about one minute. *Id.* at ¶ 10. The WCADF has a strip search area with five stalls separated by privacy screens, so they can search up to five detainees at a time. *Id.* at ¶ 7.

When Robinson returned from court on September 19, 2018, he went to the strip search area with four other detainees, so each stall was full. *Id.* at ¶ 8. Robinson went to a stall on the end, where Defendant Budde searched him. *Id.* The search proceeded normally at first. But when the time came for Plaintiff to pull down his underwear, he was aroused. *Id.* at ¶ 19. In response, Budde put an open hand over his own mouth, which Robinson interpreted as a

---

[1] The Court cites to Defendant's Statement of Facts rather than to Plaintiff's response because, as discussed below, there is no response from the Plaintiff. Any facts in Defendant's Statement of Facts properly supported by the record are thus deemed admitted and are uncontested for purposes of this motion. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion. We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.") (citations omitted).

"taunting gesture." *Id.* at ¶ 20. Budde then said "wow" and "mmm-mmm-mmm." *Id.* As Robinson was getting dressed, Budde whistled a "catcall" and was smirking while he walked out of the strip search area. *Id.* at ¶ 21.

Robinson never claimed that Budde touched him or caused physical pain, but the incident left him emotionally shaken. Robinson felt humiliated, and he isolated himself in his housing unit. *Id.* at ¶ 24. He also claims that he had insomnia for a couple of days and that his anger over the issue may have contributed to an altercation several days later. *See* Pl.'s Supp. Statement of Facts, at ¶ 3 (Dckt. No. 59). Robinson never sought counseling or any other official treatment related to the incident. *See* Def.'s Statement of Material Facts, at ¶ 28 (Dckt. No. 51).

About a week after the incident, Robinson attempted to complain about Budde's conduct by filing an official grievance. *Id.* at ¶ 25. Grievances are usually submitted to a WCADF officer known as a "pod officer." But when Robinson tried to give his completed form to his pod officer, the officer wouldn't take it. *Id.* at ¶¶ 25, 30–35. The officer – misunderstanding the nature of Robinson's grievance – told Robinson that he could not grieve the strip search because it was a facility security measure. *Id.* at ¶ 25.

But Robinson was trying to grieve the *manner* of the search, not the fact of the search itself. *Id.* at ¶ 26. That is, he took issue with how Deputy Budde conducted the search, not whether Deputy Budde should have conducted a search at all. And detainees can, in fact, grieve the manner of a search. So Robinson's grievance was actually proper, and the officer should not have rejected it. But in light of the officer's refusal to accept his grievance form, Robinson did not pursue his claim further within the detention facility. *Id.* at ¶ 27.

## Procedural History

Instead, Robinson filed this lawsuit against Deputy Budde. Robinson, who is represented by counsel, claims that the strip search violated his right to due process under the Fourteenth Amendment. *See* Second Am. Cplt., at ¶ 13 (Dckt. No. 39).

Robinson filed suit in March 2019 and filed an amended complaint later that year. *See* Dckt. Nos. 6, 31. Those complaints included additional counts about other constitutional violations, but after Budde filed a motion to dismiss, Robinson moved to strike his own first amended complaint. *See* Dckt. No. 36. This Court granted Robinson leave to file a second amended complaint, which Robinson later filed. *See* Second Am. Cplt., at ¶ 13 (Dckt. No. 39).

Budde has now moved for summary judgment and makes three arguments. *See* Dckt. No. 49. First, as a procedural matter, Budde argues that Robinson failed to exhaust the administrative remedies available to him at WCADF, which would bar his lawsuit under the Prison Litigation Reform Act ("PLRA"). *See* 42 U.S.C. § 1997e(a); Mem. in Support of Summ. J., at 7–8 (Dckt. No. 50). Second, as a substantive matter, Budde contends that no reasonable juror could find that Robinson's allegations rise to the level of a constitutional violation. *Id.* at 3–7. And finally, Budde argues that Robinson can only recover nominal damages on his claim because he has not made a showing of any physical injury. *Id.* at 9–10.

There is one additional procedural wrinkle: Robinson did not file a response to Defendant's statement of material facts. Budde filed his summary judgment motion, memorandum of law in support, and Rule 56.1 statement of material facts on June 25, 2020. *See* Dckt. Nos. 49–51. This Court then entered a briefing schedule on the motion. *See* Dckt. No. 52. Robinson asked for an extension, which this Court granted, resetting the due date for his response and for the reply. Robinson ultimately filed a three-page "Response to Defendant's

Motion for Summary Judgment," as well as a 13-page response brief. *See* Dckt. Nos. 57–58. He also filed a "Supplemental Statement of Uncontested Material Facts Pursuant to Local Rule 56.1." *See* Dckt. No. 58.

The Local Rules allow the non-moving party to add facts to the record. Specifically, the Local Rules allow Robinson to "assert facts not set forth in" Budde's Rule 56.1(a)(2) statement by filing a statement of additional material facts. *See* Local Rule 56.1(b)(3). But the opportunity to add new facts is not a substitute for the non-moving party's obligation to respond to the facts offered by the moving party. The Local Rules state that a party opposing summary judgment "shall serve and file . . . a response to the LR 56.1(a)(2) statement of material facts." *See* Local Rule 56.1(b)(2). Robinson did not file a response to the Defendant's statement of facts. He simply filed a statement of additional facts. He added new facts but did not respond to the old ones (meaning the facts offered by Budde in his summary judgment motion).

Robinson is represented by counsel, so this case does not involve a *pro se* litigant who does not understand the process. The Court therefore treats as uncontested any facts in Budde's statement that are supported by the record. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012) ("Because Keeton failed to file a response to Morningstar's Local Rule 56.1 statement of facts in the district court, we credit Morningstar's uncontroverted version of the facts to the extent that it is supported by evidence in the record.") (citing *FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005)); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997) (explaining that "where [a] party has not followed the local rules requiring a response . . . the moving party's facts remain uncontested" and so the "failure to properly contest . . . constitutes a binding admission of those facts").

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.,* 477 U.S. at 322–23; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

Summary judgment is the time for a party to put its evidentiary cards on the table. "[S]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)).

**Discussion**

I.    **Exhaustion**

The Court addresses exhaustion first. Ordinarily, exhaustion is a "threshold issue[]" that a district court should decide before the merits. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014). "[T]he statutory goal of sparing federal courts the burden of prisoner litigation until and unless the prisoner has exhausted his administrative remedies" is best served by investigating exhaustion at the outset, rather than waiting until summary judgment. *See Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). But it is also true that exhaustion under the PLRA is an affirmative defense. *See Jones v. Bock*, 549 U.S. 199, 212 (2007). "Defendants may waive or forfeit reliance on § 1997e(a), just as they may waive or forfeit the benefit of a statute of limitations." *See Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999).

Here, Defendant Budde raised exhaustion alongside his substantive arguments for summary judgment. The Seventh Circuit has explained that it is not a "best practice[]" to combine exhaustion and summary judgment, especially since exhaustion is meant to weed out cases up front, rather than waiting until discovery is finished. *See Wagoner v. Lemmon*, 778 F.3d 586, 591 (7th Cir. 2015). Still, because exhaustion is waivable, district courts typically do not consider the issue until defendants actually raise it. Raising the issue late in the game is suboptimal, but the Seventh Circuit has previously found "no reversible error" in considering exhaustion at the summary judgment stage. *Id.* at 593.

Also, consistent with Robinson's lack of opposition to Budde's facts, Robinson has not asked for a *Pavey* hearing to resolve any contested factual issues about exhaustion. Since the parties agree on the facts, there is no need for a hearing. *Cf. Roberts*, 745 F.3d at 234 (explaining that a *Pavey* hearing is necessary when there is a factual dispute between the parties regarding

exhaustion); *Salley v. Parker*, 2020 WL 4736412, at \*7 (N.D. Ill. 2020) (explaining that "if the court can resolve the question of exhaustion based on the documentary evidence, a hearing is unnecessary") (cleaned up).

Turning to the substance of the exhaustion issue, the PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." *See* 42 U.S.C. § 1997e(a). This requirement "applies to both pretrial detainees and convicted prisoners." *See Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015).

The language of the statute is "mandatory." *See Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). But the text does include one critical limitation. The administrative remedy must be "available" to the inmate. *See* 42 U.S.C. § 1997e(a). "An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 136 S. Ct. at 1858. An administrative remedy is "available" if the grievance procedure is "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). And, important for the analysis here, the Supreme Court explained that an administrative remedy is not "available" if prison officials "thwart inmates" from pursuing the process "through machination, misrepresentation, or intimidation." *Id.* at 1860.

The facts here are undisputed. Budde concedes that Robinson filled out a grievance form and tried to turn it in to an officer, but the officer refused to take it. *See* Def.'s Statement of Material Facts, at ¶ 25 (Dckt. No. 51). The officer misinformed Robinson that it was not possible to submit a grievance about the search. *Id.* The officer refused to accept the grievance, even though Robinson's written complaint made clear that he was grieving the manner of the search, not the fact of the search itself. *Id.* at ¶ 26.

At that point, the grievance process was not "available" to Robinson. He tried to take advantage of an administrative process within the detention facility, and the jail refused. Robinson could not grieve his complaint because the jail wouldn't take his complaint. They shut the door to an administrative process, which opened the door to the courthouse.

Budde tries to hang his hat on information that Robinson apparently received from another detainee at the WCADF, after Robinson was turned down. Unlike the officer, the detainee gave Robinson the right answer. That detainee apparently told Robinson that he actually could grieve the incident because he was complaining about the manner of the search, and was not complaining about the need for the search itself. *Id.* Budde argues that, after hearing that information, Robinson should have tried again to file a grievance. *See* Mem. of Law in Supp. of Mtn. for Summ. J., at 8–9 (Dckt. No. 50). Since he didn't give it a second try, Budde argues that Robinson failed to exhaust.

But Budde offers no case law that required Robinson to give the jail a do-over. The undisputed facts show that Robinson gave WCADF a chance to address his grievance, and an officer told Robinson that the grievance system was a dead end. *See Dole v. Chandler*, 438 F.3d 804, 810 (7th Cir. 2006) (concluding that a prisoner exhausted when he had "already given the prison administrative process an opportunity to resolve his complaint"). That "misrepresentation" (in the *Ross* Court's terms) rendered the normal grievance process "unavailable" to Robinson. *Ross*, 136 S. Ct. at 1860. A grievance process is not available if the detention facility will not accept the grievance. Robinson was therefore not barred from filing this suit.

Plus, Budde's argument asks too much of Robinson. Consider Robinson's position after he talked to the other detainee and heard that he might be able to file a grievance after all. At

that point, he had an officer telling him one thing and a fellow detainee telling him another. It is

perfectly reasonable for Robinson to rely on what the pod officer (who, remember, is tasked with

accepting detainee grievances) told him, rather than forcing him to track down every lead that he

heard through the grapevine at the facility. While it is true that, in this case, the officer turned

out to be wrong and Robinson's fellow detainee was right, in general a detainee does enough if

he follows official guidance regarding grievance procedures. *See Strong v. David*, 297 F.3d 646,

650 (7th Cir. 2002) (explaining that, when a grievance meets all of the Administrative Code's

written requirements, it cannot be dismissed because of a requirement on which "the

administrative rulebook is silent").

Robinson tried to submit a grievance, and the facility refused to accept it, based on the

false notion that he could not grieve that issue. At that moment, the grievance process was

unavailable. The grievance process did not spring back to life and become available when

Robinson spoke to a fellow inmate. A detainee should be entitled to rely on what the detention

facility tells him. If the shoe were on the other foot, the jail undoubtedly would argue that the

inmate must rely on what the jail – not another inmate – tells him.

Robinson experienced something akin to "Lucy and the Football" – he did not have to

take another run at the ball. He tried to submit a grievance, and the detention facility refused. So

he exhausted the process that was available.

## II.     The Merits of the Claim

The Court next considers whether the substance of Robinson's claim entitles him to

relief. The Court concludes that no reasonable jury could find that Budde's conduct rises to the

level of a constitutional violation.

Robinson claims that Budde's conduct violated his Fourteenth Amendment rights. Robinson is correct that, "as a pretrial detainee, [he] was protected by the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's prohibition against cruel and unusual punishment, which applies only to convicted persons." *See Henderson v. Sheahan*, 196 F.3d 839, 844 n.2 (7th Cir. 1999).

The Supreme Court has explained that "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *See Kingsley*, 576 U.S. at 400 (citation omitted). So, the Court must evaluate whether Budde's conduct rises to the level of constitutionally cognizable "punishment" under the Fourteenth Amendment.

*Kingsley* is a recent case, and the parties identify no authority applying it to the factual scenario present here – a pretrial detainee challenging the manner of a search. But, in Seventh Circuit caselaw discussing *Kingsley* and acknowledging the difference between "punishment" for Fourteenth Amendment purposes and "cruel and unusual punishment" for Eighth Amendment purposes, the Seventh Circuit described "little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement claims." *See Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015). "In both cases, [] the alleged conditions must be objectively serious enough to amount to a constitutional deprivation[.]" *Id.* at 309.[2]

Figuring out when conduct is objectively serious enough to constitute "punishment" under the Fourteenth Amendment is somewhat tricky. The Supreme Court has explained that, "if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or

---

[2] In his briefing, Robinson concedes that "Defendant correctly states that the Courts apply the same Eighth Amendment analysis in evaluating Fourteenth Amendment claims." *See* Pl.'s Mem. in Opp. to Mtn. for Summ. J., at 2 n.1 (Dckt. No. 58).

purposeless – a court permissibly may infer that the purpose of the governmental action is punishment." *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979).

The *Bell* Court also gave some additional guidance beyond the "arbitrary or purposeless" standard. It pointed to factors first identified in *Kennedy v. Mendoza-Martinez* that "provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment." *Id*. at 538. The *Mendoza-Martinez* factors include: "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions." *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963).

The "arbitrary or purposeless" test initially sounds broad, but the *Bell* Court's reasoning shows that the restriction or condition must also impose some significant hardship. For example, in *Bell*, the Supreme Court evaluated a "double bunking" policy to determine whether that practice constituted "punishment in the constitutional sense of that word." *See Bell*, 441 U.S. at 538. In finding that the policy did not raise a constitutional problem, the Court explained that "genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." *Id*. at 542. But the Court added that "nothing even approaching such hardship" was present on the record before it. *Id.*; *see also id.* at 538 ("'There is, of course, a *de minimis* level of imposition

with which the Constitution is not concerned.'") (citing *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)).

This Court evaluates the claim at hand under the standard laid down in *Bell* and *Mendoza-Martinez*. That is, the question is whether the conduct was "objectively serious enough to amount to a constitutional deprivation," which the Court assesses by evaluating whether the conduct was "reasonably related to a legitimate goal" and involved "genuine privations and hardship over an extended period of time." *See Smith*, 803 F.3d at 309; *Bell*, 441 U.S. at 539, 542; *see also Hart v. Sheahan*, 396 F.3d 887, 892 (7th Cir. 2005) ("'Punishment' . . . is really just a name for unreasonably harsh treatment meted out to inmates who have not yet been convicted of any crime.").

While the parties agree that Budde had the legitimate authority to perform a strip search of Robinson, "[t]he question whether an otherwise permissible search is conducted in a reasonable manner is a different one." *Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007). Regardless of the validity of the search itself, "the manner in which the search [was] conducted must itself pass constitutional muster." *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009). A plaintiff challenging the manner of a search must "show that the search[ was] conducted in a harassing manner intended to humiliate and cause psychological pain." *Id*. Even then, in order to run afoul of constitutional standards, a violation "must be, objectively, sufficiently serious" to result in liability. *Henderson*, 196 F.3d at 845 (internal citation and quotation marks omitted); *but see Dobbey v. Illinois Dep't of Corr.*, 574 F.3d 443, 446 (7th Cir. 2009) ("The line between 'mere' harassment and 'cruel and unusual punishment' is fuzzy . . . .").

Robinson alleges that Budde engaged in only verbal harassment. He is a pretrial detainee, so the Fourteenth Amendment (not the Eighth Amendment) applies. To date, the

Seventh Circuit has evaluated a words-as-punishment theory under the Eighth Amendment, but not the Fourteenth Amendment. Still, there is "little practical difference" when it comes to conditions of confinement claims, so the Court takes cues from the Seventh Circuit's discussion of verbal punishment under the Eighth Amendment. *See Smith*, 803 F.3d at 310.

The Seventh Circuit at one point adopted a categorical approach to the constitutional implications of verbal harassment of prisoners: "Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). Words alone did not punish. So cruel speech could not inflict a constitutional injury.

But the Seventh Circuit has since rejected that bright-line approach, explaining that "[t]he proposition that verbal harassment cannot amount to cruel and unusual punishment is incorrect." *See Beal v. Foster*, 803 F.3d 356, 357 (7th Cir. 2015) (refusing to dismiss a claim on the basis that it alleged only verbal abuse). Instead, the Seventh Circuit clarified that "most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment." *Id.* at 358.

If words alone can inflict a constitutional injury, "simple verbal harassment" won't cut it. *See Lisle v. Welborn*, 933 F.3d 705, 718 (7th Cir. 2019). In the Eighth Amendment context, verbal abuse can give rise to a constitutional violation only in "extreme" cases. *Id.* at 719. For example, the Seventh Circuit recently held that statements allegedly made by a nurse about an inmate's failed attempted suicide could constitute cruel and unusual punishment because "medical staff use[d] an inmate's known psychological vulnerability to cause psychological anguish." *Id.* at 718–19. But the Seventh Circuit also cautioned that "[w]e intend this holding to be narrow. Repugnant words . . . will seldom rise to an Eighth Amendment violation." *Id.* at

719; *see also id.* (explaining that "[t]he Eighth Amendment nevertheless can apply to an extreme case").

This reasoning fits with other Seventh Circuit decisions considering mere verbal abuse. In *Beal*, the Seventh Circuit found that a prison guard's repeated sexual remarks and acts that led an inmate to seek psychological services and caused a fear of sexual assault at the hands of other inmates went beyond simple verbal harassment. *See Beal*, 803 F.3d at 357–58. And in *Mays*, the Seventh Circuit found that strip searches conducted in a cold room, using unsanitary gloves, while guards uttered demeaning comments to the prisoners being searched, could have crossed constitutional lines. *See Mays*, 719 F.3d at 649–50; *see also Leathers v. Johnson*, 2020 WL 4819051, at *4 (N.D. Ind. 2020) (holding that a prison guard who requested oral sex and made sexual gestures towards a prisoner while the prisoner was shining the guard's shoes had gone beyond "simple verbal harassment"); *Lewis v. Ross*, 2020 WL 6487525, at *3 (S.D. Ind. 2020) (holding that a guard who threatened to have an inmate beaten and sexually assaulted was not entitled to summary judgment).

Here, the humiliating remarks directed at Robinson did not inflict a punishment and thus did not give rise to a constitutional violation. This case is about a one-time incident. The undisputed facts show that Robinson felt humiliated by Budde's comments, that he isolated himself in his cell for a couple days, and that he had insomnia for a similar length of time. *See* Def.'s Statement of Material Facts, at ¶ 28 (Dckt. No. 51). Robinson never sought psychological care related to the incident. *Id.* There is no evidence of a compounding factor, like underlying psychological vulnerability, fear of attack, repeated incidents of abuse, or other improper conditions of the search that have been present in the rare cases in which the Seventh Circuit has found a constitutional problem with "repugnant words" alone.

Robinson's claim has none of the other indicia of seriousness that have led the Seventh Circuit to find a constitutional violation in verbal harassment cases. Plus, several of the *Mendoza-Martinez* factors weigh against finding a constitutional violation. Budde's comments imposed no affirmative disability or restraint. Historically, courts would not have considered this type of conduct to be punishment. The Seventh Circuit has only recently recognized speech-as-punishment claims, and even then, such claims are viable only in "extreme" circumstances (which these are not). A

Overall, the undisputed facts do not establish a Fourteenth Amendment violation. *Cf. Webber v. Pharis*, 2015 WL 475956, at *7 (N.D. Ill. 2015) ("Similarly, Nappier is not alleged to have done anything other than speak with plaintiff and escort her down the hallway to the nurse's office. Such conduct clearly does not approach being either 'malicious and sadistic' or 'punishment'."); *Belk v. Watson*, 2021 WL 1171652, at *2–4 (S.D. Ill. 2021) ("Count VI arises from the latter type of 'simple' harassment. It does not amount to punishment at all and supports no constitutional claim against the defendants.").

Robinson's final arguments do not move the needle. He argues that Budde violated prison policy, and that "prison policy statements" create a protected liberty interest. *See* Mem. in Opp. to Mtn. to Dismiss, at 6 (Dckt. No. 58). But "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006).

In a similar vein, Robinson makes a passing reference to other incidents involving Budde and other detainees, but they do not elevate Robinson's incident to a constitutional infraction. *See* Pl.'s Supp. Statement of Facts, at ¶¶ 22–23 (Dckt. No. 59). While a pattern of abuse can

"bear on the question of [the] severity" of the incident, it is not clear why isolated incidents between Budde and *other* detainees would make Budde's treatment of Robinson worse. *See Beal*, 803 F.3d at 358. The other incidents involving Budde, one from 2017 and one from an unspecified time, do not show the type of targeted or patterned abuse present in *Beal*. *Id.* at 358 (describing repeated harassment of a single plaintiff). Plus, *Beal* had other compounding factors. *See id.* at 358–59 (explaining that plaintiff sought psychological services, had a well-founded fear of sexual assault, and was subject to physical intimidation at the hands of the guard). Robinson, by contrast, has not put forward evidence of a similarly severe pattern of abuse.

The Court finds that Robinson has not come forward with facts that could support a verdict by a reasonable jury that Budde committed a constitutional violation. Budde is thus entitled to summary judgment.

But one final point bears special emphasis. The Court's analysis of Robinson's claim addresses only whether Budde's conduct rose to the level of a constitutional violation. This ruling does not mean that Budde comported himself appropriately. Far from it. Budde's conduct was totally inappropriate, and Robinson deserved better.

### Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment.


Date: April 30, 2021

Steven C. Seeger
United States District Judge


17